## B. A. CARROLL STEVEDORING CO., Inc.,
## v. UNITED STATES et al.
### No. 319.

District Court, D. Massachusetts.

Oct. 31, 1938.

Francis J. Carney and William J. Killion, both of Boston, Mass., for libelant.

John A. Canavan, U. S. Atty., and Robert W. Meserve, Asst. U. S. Atty., both of Boston, Mass., and Myron H. Avery, of the Maritime Commission of Washington, D. C., for libelees.

FORD, District Judge.

This is a suit in admiralty brought by the libellant under the provisions of Section 33 of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. Section 933, for the benefit of itself and one John Kehoe, a stevedore in its employ, for personal injuries alleged to have been received by him in an accident aboard the S.S. "West Harcuvar," a vessel owned by the United States and operated for the United States by Rogers and Webb, of Boston, under the trade name of the "Yankee Line."

The findings of facts and conclusions of law appearing herein are intended as a compliance with Admiralty Rule 46½, 28 U.S.C.A. following section 723.

John Kehoe, a stevedore, on April 9, 1929, was employed by the libellant as a foreman of a group of longshoremen whose

duty it was to unload the S.S. "West Harcuvar" while it was tied up at Pier 44, Mystic Wharf, in the City of Boston. The accident happened shortly after 1 p. m., just after the injured man had seen to it that his men had begun their afternoon duties in No. 4 hatch of the vessel. They had begun to unload the ship on the day previous to the accident. The vessel was docked with the port side of the ship alongside the dock, and an ordinary wooden painters' ladder was furnished to allow the longshoremen, officers, and crew to board and leave the ship. The ladder was about thirty feet long, rested on the dock, and leaned against the rail of the ship at an angle which varied with the rise and fall of the tide.

The injured man, John Kehoe, had just left his gang in No. 4 hatch of the vessel, had crossed the deck and gone up a four-foot stationary ladder that ran from the deck to the top of the ship's rail which brought him on top of the latter facing the dock. Having reached the rail he turned around, grasped hold of the ladder, and started down the ladder toward the dock. These facts are undisputed. He further testified that when he reached the fourth rung of the ladder, he felt the ladder turn and he fell into a space about four feet wide between the dock and the ship upon some logs which had been placed in the water between the ship and the piling of the wharf for the purpose of serving as fenders to keep the ship away from the dock. He fell a distance of about twenty-five feet.

No question of jurisdiction was raised by the libellee in this case. It would avail little to have done so. The Admiral Peoples, 295 U.S. 649, 55 S.Ct. 885, 79 L.Ed. 1633; The Shangho, 9 Cir., 88 F.2d 42; The Berwindglen, D.C., 14 F.Supp. 992.

The plaintiff relied upon two grounds in order to recover, viz.:

(1) That the ladder that was furnished for the purpose of boarding and leaving the ship was not properly lashed; and

(2) That Kehoe was caused to fall because of the negligence of the defendant in failing to provide a proper gangway or other proper means of boarding and leaving the steamship.

Although there was no dispute that Kehoe had fallen from the ladder a distance of twenty-five feet onto the logs mentioned above and was injured thereby, yet the evidence in the case as to the cause of his fall was very conflicting.

The injured man testified that the painters' ladder was in use on Monday, the day before the accident, and he had used it several times to board and leave the ship and in doing so had observed before the accident, from the time he commenced to use it, that the ladder was not fastened or lashed to any part of the vessel. He produced several witnesses, some of whom had not seen the accident, who testified that they saw the ladder a short time before the accident and it was not lashed. Some of these witnesses said it was not lashed on Monday and others, some of them officers in the Longshoremen's Union, testified they went aboard after the accident by the same ladder from which the injured man fell and that it was not lashed to the ship in any manner. It appeared, however, that at no time was any complaint made on this score to any of the officers of the ship. One Daniel J. Coughlin, who worked as a time-keeper for the libellant, and called as a witness for it, in a statement given at the time of the accident stated that he could not say whether the ladder was made fast or not, that it might have been and might not; that the ladder rested on the vessel just before the accident at an angle of forty-five degrees and that he had no difficulty in getting on and off the ship. This same witness, whose duty it was to investigate the accident and make a report to his superiors, the libellant in this case, stated, in his report that there were only two eyewitnesses to the accident, one of whom, Luke Long, was deceased at the time of trial, but from whom a statement was taken at the time of the accident and which will be discussed later. The Log Book of the ship listed Long and Hanlon as the witnesses to the accident as also did the reports of the libellant to the United States Employees' Compensation Commission. The other eyewitness, one Walter J. Hanlon, testified at the trial that he saw the accident; that the ladder tipped and slid on the ship's rail for five or six feet; and that it was not tied or lashed to the rail or any other part of the ship. However, in a statement given to one Captain Christopher Kennedy, an investigator for the United States Protection and Indemnity Insurance Company on April 24, 1929, which was about two weeks after the accident, Hanlon stated: "He (Kehoe) apparently took a couple of steps down and then what

actually happened, I cannot say, but the next thing I saw was Kehoe falling from the ladder and in between the ship's side and the pier. I thought at the time that the gangway half turned around with him, but am not sure. * * * The manner in which it was made fast I cannot tell, nor did I take any particular notice having no occasion to use it." This statement would give the impression that the question in dispute was not whether or not the ladder was made fast, but the manner in which it was made fast, and it seems to me the witness Hanlon assumed in his statement that it was made fast in some manner, but that he had not paid any particular attention as to how it was fastened. It is necessary in this case, because of the divergent stories told by the witnesses, to subject the statements that were made immediately after the accident to close scrutiny in order to get at the actual facts. The witness, Coughlin, the time-keeper mentioned above, testified at the trial that the same witness Hanlon made a statement to him immediately after the accident and he wrote down what Hanlon said. In this account of the accident given to Coughlin, Hanlon stated that the injured man, "turned to go down the ladder to the dock became overbalanced and fell between the ship and the dock."

The libellee introduced evidence of the Master of the vessel, other officers of the ship and seamen, including one of the latter who was the first person down the ladder after the accident, and all these witnesses testified that they saw the ladder immediately after the accident from which Kehoe fell and that it rested on the bulwark of the ship and was made fast by a heaving line passed over the top of the ladder to secure it. The line was made fast to an angle iron on the inside of the ship, used to support the bulwark. A one-inch slack was left in the rope so that the ladder could slide up and down with the nine-foot rise and fall of the tide and it had been secured in this manner from the time the ship docked on the Sunday before the accident. It had been employed by the officers, the crew, and the longshoremen for the purpose of boarding and leaving the ship up to the time of the accident. There were no other means provided for this purpose. It was shown also in evidence that these same witnesses had made similar written reports including diagrams immediately after the accident.

There was also placed in evidence by the libellee the statement of the deceased eyewitness, Luke Long, which was made by him immediately after the accident, in which he said that the injured man, Kehoe, "seemed to lose his balance, grab for the ladder * * * he fell." Again it is well to notice in this statement, the only other one made by an eyewitness, that it fails to refer at all to the lashing or securing of the ladder, and it seems to me that if there was any question about whether or not the ladder was lashed, this man would have been requested to make some statement concerning it. Although it is not conclusive, yet I am of the opinion that such a deduction can be properly made and as I have said before, it is the only way that I can tell which set of witnesses is painting the true picture.

Again, in view of the diametrically opposite stories that were told by the witnesses presented by the parties in this case it was of inestimable value to hear them testify. The testimony of most of the witnesses for the libellant was not convincing as to the facts concerning the lashing of the ladder. Many of them had not seen the accident and most of them stated for the first time in the course of an investigation made by an insurance company, two years after the accident happened, that the ladder was not fastened or lashed, and as described above the single eyewitness (Hanlon) produced by the libellant in his original statement said unequivocally that he could not say how the accident happened and that he had not noticed the manner in which the ladder was made fast, and yet at the trial he stated it was not lashed at all. Again in this connection it should be pointed out that in the libellant's answer to an interrogatory of the libelee asking for the particulars in which it was contended that the ladder was not securely fastened to the steamship, the libellant replied: "The ladder was not properly lashed at or near ship's rail." What was originally relied on by the libellant was, not that the ladder was not lashed at all, which was the picture it presented at the trial, but that the ladder was not "properly" lashed. And again in a report of the libellant to the United States Employees' Compensation Commission, dated the same day as the accident, in answering a question as to how the accident happened it was merely stated that he (Kehoe) fell off the ladder. No reference was made as to the lashing of the ladder.

In view of the state of this evidence it is difficult to determine just what caused the injured man to fall from the ladder. The probability seemed to point to the conclusion that he became overbalanced and fell. I cannot find from the evidence that the ladder tipped and slid on the rail as some of the witnesses for the libellant testified.

Upon all the evidence introduced in this case, I find that the libellant has not sustained the burden imposed upon it of proving as it contended in its amended libel that the libellee was negligent in providing a ladder which was not securely fastened to the steamship, nor has it established that it was not lashed at all. On the other hand, I find that the ladder furnished as a means of ingress and egress from this vessel was securely and properly lashed to the steamship in the manner described by the witnesses for the libellee, and hence the libellant cannot recover against the libellee on this ground.

On the second phase of the case relating to the question of the unseaworthiness of the vessel in that the libellee was negligent in failing to furnish John Kehoe, the injured man, with a proper means of ingress and egress from the vessel, I make the following special finding of facts:

In the water between the vessel, as it lay tied up, were three fenders, one at the forward part of the ship and two aft. These fenders were about fifteen inches thick, made fast to the wharf and served the purpose of breasting the ship from the wharf in order to protect the piling and provide increased space in which to work; that on the edge of the wharf was a cap log about a foot in width and at a height of several inches from the floor of the wharf; that the vessel had as part of the regular equipment of the ship this painters' ladder and at no time at Pier 44 where the accident occurred were any other means used for boarding and leaving the ship than the painters' ladder lashed as found above in the manner described; that the ship was equipped, as were all the boats of the "Yankee Line", of which the S.S. "West Harcuvar" was one, with what is known as a "shipside gangway" attached to the side of the ship. The "shipside gangway" is the type commonly used in the United States Navy. The base of this type of gangway or ladder could not be swung away from the side of the ship as could the type known as the "accommodation ladder" which some of the vessels constructed about the time of the accident had as part of their regular equipment. These "accommodation ladders" could be turned out at right angles to the ship and run directly into the sheds of the wharves in the same manner as the type of gangway commonly used on passenger ships. The "West Harcuvar" in the month of April, 1929, when the accident occurred was not equipped with this type of "accommodation gangway" and was not so equipped until six or eight months after the accident, which fact is of no importance, .has no bearing on this case, and has been given no consideration. It was the well established practice in 1929 to use a painters' ladder for the purpose of boarding and leaving the ships of the "Yankee Line" at Pier 44, as also at Pier 43, which it used at times, when the vessels were tied up to the piers, and it was a generally well established practice for ten years before this time to use this type of ladder for these purposes in the port of Boston. The evidence further showed, and I find as a fact that the type of ship's gangway with which this vessel was equipped could not safely be used at Pier 44 of Mystic Wharf, where it was unloading at the time of the accident, because of the conditions existing at the pier where the vessel was docked. The fact that the ship's gangway with which this vessel was equipped was used at Philadelphia and Baltimore is of no consequence in the instant case. Conditions there were different, and the evidence showed it could be used at both those cities with safety, principally because of the fact that the vessel docked close alongside the wharf and there was no cap log. As the vessel was placed directly alongside the wharf, the ship's gangway with which it was equipped could not have been used with safety . because of the fact that there was not room enough for it to go down in the space between the ship's side and the dock which was caused by the fenders in the water, the width of the ship's gangway being equivalent to that of the fender logs. There were two wheels on this gangway, one on each edge, and it would be necessary, if it could be used, to place one wheel on a two or three inch space at the edge of the cap log and allow the other wheel to remain in the air. In this position it would be apt to throw a man off this ladder if there was a movement of the ship and it caught him going up or down. Also at low water the gangway would be off the dock several feet, and could not be utilized for ingress

and egress from the ship as it would be impossible for a person to get up or off the gangway with safety.

Consequently, I find that it was neither safe nor practical to use the ship's gangway with which the "West Harcuvar" was equipped for the purpose of boarding and leaving the ship, and that the better and a safe method was the use of the painters' ladder.

There was no evidence of negligence on the part of the libellee in furnishing the injured person the painters' ladder as a means of boarding and leaving the ship. It was part of the regular equipment of the vessel and was a safe means to employ for these purposes. Further, it was not negligence on the part of the ship not to furnish the type of "accommodation ladder" that was used on some other freight vessels and passenger ships at the time this accident occurred. The libellee was not compelled to furnish the latest invention in equipment for boarding and leaving vessels. In fact there is nothing in this case to show the accident would have been prevented if the latest type of "accommodation ladder" was used. It is well settled that it is the duty of both the owner and the ship to use due diligence to provide suitable and safe equipment, and it was performed in this case.

See The Berwindglen, supra; The Rheola, C.C., 19 F. 926; Burton v. Greig, 5 Cir., 271 F. 271.

Libel dismissed with costs.